IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JIM DESMOND                                           Case No. 09-34-GLL

        Plaintiff,

vs.

PHILLIPS & COHEN ASSOCIATES, L.T.D.

        Defendant.

## MOTION FOR LEAVE TO AMEND COMPLAINT

**A.   FACTS**

1.   America is a society made up of rules. We trust that each one of us will comply with those rules. When those rules are broken there is a sense of betrayal. Phillips & Cohen broke the rules in its attempt to make a profit from a vulnerable grieving widow.

2.   Phillips & Cohen specializes in collecting debt from the dead.

3.   According to a recent New York Times article dated March 4, 2009, "[D]ead people are the newest frontier in debt collecting, and one of the healthiest parts of the industry. Those who dun the living say that people are so scared and so broke it is difficult to get them to cough up even token payments. Collecting from the dead, however, is expanding." " Adam Cohen, chief executive of Phillips & Cohen Associates of Westampton, N.J., said his team of 300 collectors 'are trained in the five stages of grief.' If a relative is more focused on denial or anger instead of, say, bargaining, the collector offers to transfer him to the human resources company Ceridian LifeWorks, where 'master's level grief counselors' are standing by. After a week, the relative is contacted again."

4.     Phillips & Cohen will try to get a "morality payment" from the surviving spouse if there is no estate and no assets left behind.

5.     Phillips & Cohen's Probate Training Manual defines "morality payment" and tells collectors how they can get paid when there is no estate and no assets:

**What if there is no estate and no assets? How can I get paid?**
When there is no estate, and you have confirmed this with the court or at least confirmed that there are no assets via the [Credit Bureau Report] (if the court won't provide you with this information over the phone), we have to rely on motivating the family to make a "morality payment." This is where we try to convince the family to pay the debt, or settle the debt, based on a "sense" of moral obligation. **NEVER TELL THE FAMILY THAT THEY ARE LEGALLY REQUIRED TO PAY THE DEBT!** You may ask them if they benefitted from the card/credit while the debtor was alive, or tell them the debtor had good credit all his life and would want his debts to be resolved upon his death. We get a lot of money this way .... don't become discouraged. (Emphasis in the original).

6.     Phillips & Cohen's collectors get bonuses based on how much money they collect. They masquerade as "grief counselors" to make a profit. They use false sympathy to take advantage of widows who are in a weak state of mind. The five stages of grief developed by Dr. Kubler-Ross is turned upside down and used by Phillips & Cohen to manipulate widows to pay money they do not owe. For the sake of making a buck, Phillips & Cohen, with its "morality payment", tries to make a widow feel guilty or responsible for a debt that isn't theirs to pay. They prey on people who recently lost a loved one. Their conduct is manipulative and predatory. Put quite simply, Phillips & Cohen values money over people's lives.

7.     On November 14, 2007 Jim Desmond's wife, Jill, lost her fourteen month battle with cancer. Jim was married to Jill for forty-two years. They got married right out of high school. Jim had a difficult time after Jill passed away. He would come home from work to the house they moved into one month before Jill was diagnosed with cancer. He would sit down in

his chair in front of the t.v. and would try to be calm. He was grieving and grieves to this very day.

8. Jim went through the process of contacting Jill's creditors. He told a representative working for Chase his wife passed away. The representative told Jim to send in the death certificate. He confirmed Jim wasn't obligated to pay on the card. He told Jim that even though he wasn't responsible to pay the balance, Chase would still try to collect on the account.

9. Chase hired Phillips & Cohen.

10. Jim would get home from work only to be met by a message on his answering machine from Phillips & Cohen or a letter from Phillips & Cohen.

11. According to the phone records and account notes produced by Phillips & Cohen, there were eight (8) phone calls made to Desmond's house during a nine (9) day period from February 20, 2008 through February 29, 2008.

12. Along with the phone calls, Desmond received a collection letter from Phillips & Cohen dated February 21, 2008.

13. Having had enough, Desmond put a message on his answering machine telling callers not to leave messages if they were calling about his wife.

14. On February 27, 2008, Jim mailed a letter to Phillips & Cohen telling them to stop. The letter was received on February 29, 2008 at 11:37 am.

15. Jim expected Phillips & Cohen to stop. This should have been the end of it. Another collector stopped after receiving a similar letter. Jim merely wanted to grieve on his own terms.

16. Phillips & Cohen phoned Jim six more times between March 3, 2008 and May 19, 2008.

17. One of these phone calls occurred on March 5, 2008. Paul Promaninsky, a collection manger for Phillips & Cohen, left a message on Desmond's answering machine. He did so despite the message Jim left on the answering machine telling callers not to leave messages if the message pertained to Jill.

18. During another phone call, Jim spoke with Amber Lohr, a collector for Phillips & Cohen. This call took place on March 7, 2008. Jim told Ms. Lohr he was tired of the calls and letters and wanted it all to stop. After attempting to get a "morality payment" from Jim, Ms. Lohr said Phillips & Cohen wouldn't bother him anymore. Jim was relieved. Ms. Lohr's statement wasn't true. Rather than take the steps necessary to close out the account, Ms Lohr marked it MMR. MMR is a status code used by Phillips & Cohen, which means "more motivation required." Promaninsky then placed the account with a different collector.

19. Besides the phone calls, Phillips & Cohen sent a letter dated May 13, 2008.

20. Jim sent a second letter asking Phillips & Cohen to stop. This letter was mailed on May 27, 2008 and received by Phillips & Cohen on May 29, 2008 at 12:24 pm.

21. Like the first letter and Jim's pleas to Ms. Lohr, this letter was ignored. Phillips & Cohen simply did not listen to Jim.

22. Phillips & Cohen sent two (2) more letters to Jim's house dated June 16, 2008 and July 3, 2008.

**B.    Amending the Complaint to Include the Phone Calls**

23. The complaint does not contain allegations regarding the phone calls. We are requesting leave to amend the complaint to include the calls, which are confirmed by the Defendant's account notes and phone records.

24. The amendment will aid in presenting the merits and the evidence will not prejudice the Defendant's action or defense on the merits. F.R.C.P. 15(b)(1).

25. The Defendant had an opportunity to conduct discovery regarding the phone calls and in fact deposed the Plaintiff regarding the calls.

26. The amendment will not send the parties through a period of additional discovery and motions.

27. To the extent the Defendant argues the amendment is outside the statute of limitations, this argument is without merit considering F.R.C.P. 15(c).

C. **Amending the Complaint to Include a Claim for Invasion of Privacy-Intrusion Upon Seclusion.**

28. Desmond's privacy was invaded by Phillips & Cohen's unreasonable intrusion upon his seclusion.

29. Desmond had a reasonable expectation of privacy in his solitude, seclusion, private affairs and concerns.

30. Phillips & Cohen intruded into Desmond's solitude, seclusion, private affairs and concerns by repeatedly contacting him for a debt he didn't owe after being told to stop.

31. Phillips & Cohen did not allow Jim Desmond to grieve on his own terms despite his repeated requests for them to stop contacting him.

32. Phillips & Cohen's intrusion -- attempting to manipulate payment from a vulnerable grieving widow after being told to stop--would be highly offensive to a reasonable person.

33. This amendment will not result in additional discovery or motions outside of the Court's scheduling order.

**D.   Underlying Legal Principles**

34. The following principles are important for the court to keep in mind while considering this motion for leave:

* F.R.C.P. 15(a)(2) states, "The Court should freely give leave when justice so requires.

* The liberal pleading philosophy of the federal rules does limit a district court's discretion to deny leave to amend. Adams v. Gould, 739 F.2d 858, 864 (3d Cir. 1984).

* Delay alone will not constitute grounds for denial. Cureton v. National Collegiate Athletic Ass'n, 252 F.3d 267, 273 (3d Cir. 2001).

* The district court has discretion to deny the request only if the plaintiff's delay in seeking to amend is undue, motivated by bad faith, or prejudicial to the opposing party. Adams v. Gould, 739 F. 2d 858, 864 (3d Cir. 1984).

* There is abundant evidence of the use of abusive, deceptive, and unfair debt collection practices by many debt collectors. Abusive debt collection practices contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy. 15 U.S.C. § 1692(a).

* 15 U.S.C. § 1692c. Communication in connection with debt collection

(c) Ceasing communication.

If a consumer notifies a debt collector in writing that the consumer refuses to pay a debt or that the consumer wishes the debt collector to cease further communication with the consumer, the debt collector shall not communicate further with the consumer with respect to such debt, except
  (1) to advise the consumer that the debt collector's further efforts are being terminated;
  (2) to notify the consumer that the debt collector or creditor may invoke specified remedies which are ordinarily invoked by such debt collector or creditor; or
  (3) where applicable, to notify the consumer that the debt collector or creditor intends to invoke a specified remedy.
If such notice from the consumer is made by mail, notification shall be complete upon receipt.

(d) Definitions.
For the purpose of this section, the term "consumer" includes the consumer's spouse, parent (if the consumer is a minor), guardian, executor, or administrator.

 * One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person. Diaz v. D.L. Recovery Corp., 486 F. Supp.2d 474 (E.D. Pa. 2007).

 * One way of meeting the requirement that the intrusion be "highly offensive to a reasonable person" is by the defendant's repeatedly intruding on the plaintiff at inconvenient times. Diaz v. D.L. Recovery Corp., 486 F. Supp. 2d 474 (E.D. Pa. 2007) citing Restatement (Second) of Torts § 652B cmt. b, illus. 5.

 * Repeated calls to home and hospital about debt not owed by consumer stated cause of action for invasion of privacy intrusion upon seclusion. Carey v. Statewide Fin. Co., 3 Conn. Cir. Ct. 716, 223 A.2d 405 (1966).

 * Claim for invasion of privacy intrusion upon seclusion stated by allegations of continuous communications to plaintiff's home in disregard for his right to privacy after repeated

requests that contacts cease. Burkhalter v. Lindquist & Trudeau, Inc., 2005 WL 1983809 (E.D. Mo. Aug. 16, 2005).

**WHEREFORE,** Plaintiff respectfully requests leave to file the amended complaint attached hereto as Exhibit A.

Respectfully Submitted,

JEFFREY L. SUHER, P.C.

/s/ Jeffrey L. Suher
Jeffrey L. Suher, Esquire
Pa. I.D. # 74924
4328 Old Wm Penn Hwy, Ste 2J
Monroeville, PA 15146
412-374-9005
412-374-0799 (fax)
lawfirm@jeffcanhelp.com

JURY TRIAL DEMANDED